IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 8, 2020 Session

## JACOB DANIEL DRUCKER v. COLLEEN ERIN DALEY

**Appeal from the Juvenile Court for Rutherford County**
No. 6737C    Adam Dodd, Judge

### No. M2019-01264-COA-R3-JV

Mother challenges the trial court's granting of father's petition to modify the residential parenting schedule to give him equal residential parenting time. She argues that the father failed to establish a material change in circumstances affecting the child's well-being in a meaningful way. We have determined that the evidence does not preponderate against the trial court's findings that there was a material change of circumstances under Tenn. Code Ann. § 36-6-101(a)(2)(C) and that modification of the parenting schedule was in the best interest of the child.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J.,[1] delivered the opinion of the Court, in which W. NEAL MCBRAYER, J., joined. RICHARD H. DINKINS, J., not participating.

Stephen Walker Pate, Murfreesboro, Tennessee, for the appellant, Colleen Erin Daley.

Edward Evan Cope, Murfreesboro, Tennessee, for the appellee, Jacob Daniel Drucker.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Jacob Daniel Drucker ("Father") and Colleen Eric Daley ("Mother") are the parents of a daughter, Danica, born in March 2008. In April 2009, the trial court entered an agreed order incorporating an agreed permanent parenting plan pursuant to which Mother was named the primary residential parent of the child.

---

[1] This case was assigned to the authoring judge on September 15, 2020.

In March 2018, Father filed a petition for modification of custody alleging that a substantial and material change of circumstances had occurred since the entry of the agreed order and that these changed circumstances justified modification of the order. Father asserted that, at the time of the agreed order, Mother lived in a county that was approximately a three-hour drive from him, but she had subsequently moved back to Rutherford County and currently lived less than a mile from his home. Father's petition included allegations regarding the child's Instagram account and his concerns about Mother's exploitation of the child through social media as well as allegations questioning Mother's judgment and fitness as a parent.

After answering Father's petition, Mother filed a counter-petition for modification of the permanent parenting plan to change the provision ordering joint decision-making. Mother alleged that there had been a material change of circumstances because of the inability of Mother and Father to agree in making decisions. The case was tried on February 4, 2019.

Father lives in Rutherford County with his wife and four-year-old son. Their house is approximately 500 yards from Mother's house. Father is employed as a project manager in the IT department at HCA and earns $84,000 a year. He described a flexible work schedule under which he can work at home several days a week and adjust his appointments and meetings to make sure Danica gets to school.

When the agreed parenting plan was entered in 2009, Mother lived in Selmer, Tennessee, about 200 miles from Rutherford County. At that time, Danica was thirteen months old. According to Father, he did not realize when he entered into the agreed order that Mother would return to Rutherford County. He felt that the child's needs had changed from the age of fourteen months to age ten.

As to the reasons why he did not file a petition when Mother first moved back to Rutherford County in 2010, Father expressed regret that he did not file sooner. He eventually filed his petition because he "had concerns over some decision-making that had happened, that was going on, that scared me for my daughter's wellbeing." Father testified that Mother set up an Instagram account using Danica's name and images "and was commenting in the first person as if [Mother] was [Danica] and had amassed close to 10,000 followers who are now allowed to view, save, and distribute any images posted at free will." Father found a follower on the Instagram page whose profile included pornographic content and alerted Mother, who blocked the follower. Father asked Mother to take down the Instagram account and did not think she was honest with him about her actions in response to his request.

At trial, Father proposed a parenting plan naming him the primary residential parent with each parent having equal parenting time. Under Father's proposed plan, the child would spend alternating weeks with Mother and Father. Danica has her own room

and clothes at Father's house and "doesn't need to pack a bag when she goes house to house [except the] occasional[ ] dance bag because there are costumes and outfits that she has more of at her mother's house." Father testified that, "as a daughter gets older, she needs to understand what a good man is, how a father loves a child, how a father loves a daughter, how a man treats his wife."

Father also requested a change from joint decision-making. He wanted to have sole decision-making authority with respect to educational decisions and the child's religious upbringing, with all other decisions remaining joint. Father explained that he and Mother disagreed about whether Danica should remain in elementary school for the sixth grade or transition to middle school for the sixth grade. Father was in favor of moving the child, who is an excellent student, to the middle school to allow her to pursue a more advanced curriculum. As to the issue of religious upbringing, Father and his wife attended church regularly and wanted to "be able to continue to bring [Danica] to church with us." Father also expressed concern about the amount of time the child spent at dance practice and competitions and the effect of that time commitment on her ability to spend time with family and do her homework as she advanced in school.

Father described the warm relationship he shared with Danica and acknowledged that Mother generally promoted a good relationship between him and the child. He further acknowledged the importance of encouraging a good relationship between Danica and Mother. Father then expressed some concerns about the stability of Mother's household—namely, that she had five children with three different fathers, none of whom resided in her house, and that she had moved five times in the past ten years.

Father stated that the current plan, which gave him 99 days a year, did not allow him the "role that I would like to play in my daughter's life." He commended Mother for her parenting of the child, and testified that he wanted to have a "bigger role in the day-to-day life of [the child], drop her off at school, pick her up, day to day help her out with homework." On cross-examination, Father acknowledged that, to date, Mother had performed the majority of the daily parenting responsibilities. There was no dispute that Danica was a happy child.

Mother has five children; at the time of the hearing, they were ages 14, 10 (Danica), 8 (twins), and 5. She worked as a receptionist and account clerk at City Auto in Murfreesboro and earned $14.00 an hour. The house where she and her children live is owned by Mother's parents, and she pays them approximately $1,500.00 a month in rent. Mother testified that, because of bad credit from her previous marriage, she did not have a checking account and would deposit her pay check into her father's bank account. With her earnings and child support, Mother's monthly income was approximately $4,750.00.[2]

---

[2] Mother testified that she had not received child support from the father of her oldest child in approximately two years.

Mother stated that she drove Danica to school every day on her way to work, and the child rode the bus home from school. Then, either Mother or the maternal grandmother would drive Danica to Franklin for dance, which lasted until about 8:00 p.m. The child was able to eat dinner and do homework during breaks at dance. Mother testified that she moved Danica to a dance studio in Franklin to accommodate Father's desire not to have dance classes over the weekend.

When asked about the lack of stability reflected in the fact that she had moved five times in ten years, Mother acknowledged that it was preferable for the child to have consistency. She stated that she had lived in her current house for about four years. Mother pointed out that, despite moving, she had remained in the same neighborhood with the child at the same school.

Mother testified that she had "bent over backwards to work with [Father] whenever he needed." She "made sure [Father] saw [Danica] when he was supposed to see her," and "[i]f he wanted to see her on top of that, I made sure it happened." Mother felt that she did "whatever it takes to nourish, replenish, and support" the relationship between Father and Danica. By contrast, she testified, Father was "willing to file bogus, frivolous petitions that will lie, fabricate, say or do whatever he has to say to sabotage my daughter's relationship with me."[3] In part because of Father's prior allegations against her, Mother opposed his proposal to modify the parenting plan.

Mother stated that, over the past ten years, she had shown consistency and continuity as a parent and had taught her daughter self-discipline and self-motivation. She testified that she performed the majority of the daily parenting responsibilities and had taken Danica to "every single [doctor's] appointment except for one." The parents agreed that Mother was responsible for getting the child to school 95 percent of the time. According to Mother, Father participates in Danica's activities "when he feels like it." He had not paid for dance or taken Danica to practice before he filed his petition for modification. Mother acknowledged that Father is a good parent and takes good care of Danica when she is with him.

Mother described Danica's close relationship with all four of Mother's other children. She further described the house where they have lived for the past four years. Danica has her own room, and the garage has been converted into a small studio for dance and play.

Mother explained that, when Danica was born, she lived in Murfreesboro. Shortly after the birth, she moved to Selmer, Tennessee, and she moved back to Murfreesboro

---

[3] In conjunction with his original petition for modification, Father filed a petition for contempt in which he alleged that Mother had mental health problems. He also requested a psychological evaluation. Father subsequently dismissed the contempt petition.

when the child was about one-year old. According to Mother, she talked to Father upon her return to Murfreesboro about reevaluating the parenting plan to increase his parenting time, but he felt that he was too busy with school. (Father denies that the parties ever had this discussion.) Mother further testified that, in the years preceding Father's filing of the petition for modification, he never asked for a change in the parenting schedule. If he asked for a day here or there, she would accommodate him.

The owner of Danica's dance studio testified that most of the children at the studio have Instagram accounts. Mother testified that she had deactivated the child's Instagram account.

Mother requested that she be given sole decision-making authority on educational matters and that the parenting schedule remain the same.

After the trial, the magistrate made findings of fact and conclusions of law, which were incorporated into the court's order entered on April 1, 2019.[4] The court concluded that there had been a material change of circumstance warranting a change in the residential parenting schedule:

> The Court does find that there is a material change in this case with regard to an adjustment of parenting time that is warranted in this particular matter. The Court would allocate or state to the parties its findings as to reasons for reallocation of parenting time in this case.
>
> The child's age at the time the plan was implemented. The child was 14 months. She's now nine years. She's about to be ten, I believe, very soon. There's a lot of difference in the needs and relationships of a 14 month old than there is in a nine or ten year old.
>
> The parties' location relative to one another. There's a lot of difference in ability to co-parent and child's accessibility to each parent between 200 miles, multiple counties away, and, you know, the next neighborhood over as we have in this particular case. And that relates to the parents' ability to facilitate a more equal and sharing parenting responsibility. I believe that to be greater now than it was nine years ago.
>
> Both are -- the father has got an MBA now. He's got a good job. Mother has been working on her own for a long time. Nine years ago, they were positioned most differently in maturity levels and all the issues involved with parenting. They each have multiple or other children in addition to Danica now so they are more seasoned parents. And I just think that it's

---

[4] The court found no evidence of bad parenting with respect to the child's Instagram account.

brought the circumstances of this case regarding the ability to share more shared parenting responsibilities has been improved greatly over this significant period of time.

In addition to that, I would note that nine years ago the wording in the statute, the legislature has stated an intent for the Court to try to maximize parenting time with both parents where possible and where it's feasible in any form, and the case law would support the legislature's designation of that. You can agree with that or not. I'm just telling you, basically, there's been a migration in the state of the law that is more geared toward, where possible, expanding parenting time. We don't have a lot of cases anymore unless there's drugs or abuse or things like that where we're limiting parenting time. We don't have any other every-other-weekends and two-weeks-in-the-summer parents these days. And that's just the state of migration of the law.

In this case, as I noted, both parents are good people. They both have good homes. There is good social networks around the homes. They have got some disagreements in issues but, you know, on a scale of issues, I'm not stating they are not important to each of you and to the child, but in a scale of issues and disputes, they are not major, and they seem within your capabilities of easily resolving.

Now, obviously, capability and willingness become sort of sparse in words and so you have to get into that. But, certainly, these are not issues that should confound or bring you to the level of where you just can't work together. They are within your grasps to work out. And there's really no reason that I can see that there's any sort of major issue between you that can't be resolved.

In all candor, it's rare to see a case, frankly, that's more suited to equal parenting time. Largely, due to the stature of parents, the -- the child's being so well-adjusted and being so high-functioning and the distance between the parties, in the Court's judgment, this case is well-suited for a designation of equal parenting time. Therefore, the Court does adopt the father's parenting plan as admitted into evidence as Exhibit Two, finding that plan to be in the child's best interest, finding that there was, in fact, a material change of circumstance based on the previously announced factors.

Based upon these findings, the court adopted Father's proposed parenting plan with some revisions. The court ordered that Mother and Father would continue to exercise joint decision-making and that Mother would remain the primary residential parent, though the parties would have equal parenting time.

The trial court denied Mother's motion to alter or amend. On July 12, 2019, the juvenile court entered an agreed order stating that, pursuant to Tenn. Code Ann. § 37-1-107,[5] the parties waived their right of de novo appeal and the order entered on June 26, 2019, denying Mother's amended motion to alter or amend would be deemed the final order of the court.

STANDARD OF REVIEW

Our review of a trial court's findings of fact is de novo upon the record accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. TENN. R. CIV. P.. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012). A trial court's determinations of whether a material change in circumstances has occurred and where the best interests of the children lie are factual issues. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Appellate courts must, therefore, presume a trial court's factual findings on these matters are correct and not overturn them unless the evidence preponderates to the contrary. *Armbrister*, 414 S.W.3d at 693.

Furthermore, as our Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).

*Id.* Trial courts have broad discretion to work out the details of parenting plans. *Id.* A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). This standard of review "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood

---

[5] Tennessee Code Annotated section 37-1-107(e) provides, in pertinent part, that "if the right to the hearing [before the juvenile court judge] is expressly waived by all parties within the specified time period, the magistrate's order becomes the order of the court." Moreover, the order is subject to appeal in accordance with Tenn. Code Ann. § 37-1-159. Tenn. Code Ann. § 37-1-107(e).

that the decision will be reversed on appeal.'" *Gonsewski*, 350 S.W.3d at 105 (quoting *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)).

ANALYSIS

Determining whether to modify the primary residential parent or the residential parenting schedule requires a two-step analysis. *See* Tenn. Code Ann. § 36-6-101(a)(2). The first step is to determine whether a material change in circumstances has occurred since the court's previous custody order. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C); *Armbrister*, 414 S.W.3d at 702; *Duke v. Duke*, No. M2013-00624-COA-R3-CV, 2014 WL 4966902, at *19 (Tenn. Ct. App. Oct. 3, 2014). If the trial court finds that there has been a material change in circumstances, the court must then address the second step of the process by determining whether it is in the child's best interest to modify the parenting plan as requested. *Armbrister*, 414 S.W.3d at 705. In the present case, the trial court determined that there had not been a material change in circumstances sufficient to warrant a change in the primary residential parent but found that there had been a material change in circumstances warranting modification of the residential parenting schedule. On appeal, Mother challenges the latter determination. She also argues that the trial court failed to make any specific findings regarding the best interest factors as required by Tenn. Code Ann. § 36-6-401(a)[6].

I.      Material change in circumstances/change in residential parenting schedule.

A material change in circumstances for purposes of modifying the primary residential parent is "'a distinct concept'" from a material change in circumstance for purposes of modifying the residential parenting schedule. *Burnett v. Burnett*, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015) (quoting *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)). A different statutory provision applies to each circumstance. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). Where the issue before the court is a modification of the residential parenting schedule only, the threshold for determining whether there has been a material change of circumstances is "much lower" as compared to the threshold for modification of the primary residential parent. *Burnett*, 2015 WL 5157489, at *6. To modify the residential parenting schedule, a showing[7] that the current schedule is not workable for the parties can be enough to satisfy the material change of circumstances standard. *Id.* (citing *Rose v.*

---

[6] Tennessee Code Annotated section 36-6-401(a) provides, in pertinent part, that, "In any proceeding between parents under this chapter [on child custody and visitation], the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities."

[7] Whether seeking to modify the residential schedule or to change the primary residential parent, the petitioner carries the burden of establishing that there has been a material change of circumstances. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C); *Armbrister*, 414 S.W.3d at 704.

*Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006)).

The statutory provision regarding modification of the residential parenting schedule provides as follows:

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C). In the present case, the trial court based its finding that there had been a material change in circumstances upon several factors: changes in the child's needs related to age (from age 14 months to age 10), changes in the location of the parties' residences (from residing 200 miles apart to living in the same neighborhood), and changes in the maturity of the parties (from being students and new parents to being employed, experienced parents). The court determined that the parties' "ability to share more shared parenting responsibilities has been improved greatly over this significant period of time."

*Relevance of impact on child's well-being*

Based upon the undisputed evidence that Danica is an excellent student and a happy child, Mother argues that Father failed to prove that the alleged changes in circumstances "'affect[] the child's well-being in a meaningful way.'" *Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at *4 (Tenn. Ct. App. Mar. 13, 2014) (quoting *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008)). Thus, we must consider whether, in the context of a motion to modify a residential parenting schedule, the petitioner has proven that the material change of circumstances affects the child's well-being in a meaningful way.

Prior to the enactment of Tenn. Code Ann. § 36-6-101(a)(1)(C), caselaw generally identified the following three factors as relevant considerations in determining whether there had been a material change in circumstances:

(1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *see also Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002). The Court in *Armbrister v. Armbrister*, 414 S.W.3d at 704, expressly overruled this line of authority to the extent that it required "a party requesting modification of a residential parenting schedule to prove that the alleged material change in circumstances could not reasonably have been anticipated when the initial residential parenting schedule was established." We find the Court's analysis in *Armbrister* instructive as to the continuing viability of the third factor regarding the effect of the changed circumstances on the child's well-being.

Under the original parenting plan in *Armbrister*, the mother was the primary residential parent, with the father spending 85 days of residential parenting time with the two minor children, ages three and almost one. *Armbrister*, 414 S.W.3d at 688-89. About one year later, the father filed a petition for modification alleging that there had been a material change of circumstances because he had remarried, his work schedule had changed, he had relocated to his own home, and the mother had not been willing to allow changes to the visitation schedule. *Id.* The mother opposed the motion, testifying that the current schedule "worked well" and that "the children were well-adjusted and stable." *Id.* at 688. The trial court concluded that the father had proven a material change of circumstances and that modification of the residential parenting schedule was in the best interest of the children. *Id.* at 691. In support of this conclusion, the trial court cited Father's relocation and remarriage, the close relationship between the stepmother and the children as well as the stepmother's positive relationship with the mother, and the distance (30 minutes) between the parents' homes. *Id.* A divided panel of this court reversed, based in part on the majority's conclusion that the father's move was "not unanticipated" at the time of the divorce. *Id.* at 692. The majority further noted that the father was dating his new wife at the time of the divorce, so the remarriage also was not an unanticipated change. *Id.*

In its opinion reversing this court's decision, the Supreme Court reviewed the historical development of the common law regarding modification of parenting plans and the requirement that there be a material change in circumstances. *Id.* at 698-702. Over time, the concept of material change in circumstances came to include the idea that "'the change has occurred after the entry of the order sought to be modified and the change is not one that was known or reasonably anticipated when the order was entered.'" *Id.* at 701 (quoting *Blair*, 77 S.W.3d at 150). The Court in *Armbrister* then proceeded to analyze the impact of Tenn. Code Ann. § 36-6-101(a)(2)(C), passed in 2004, which addresses the concept of a material change of circumstances in the context of the modification of a

residential parenting schedule only (as opposed to a change in the primary residential parent). *Id.* at 702-03.

The Court described the requirements of Tenn. Code Ann. § 36-6-101(a)(2)(C) as setting "'a very low threshold for establishing a material change of circumstances'" to modify a residential parenting schedule. *Id.* at 703 (quoting *Boyer v. Heimermann*, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007)). With respect to the issue before it, the Court stated:

> By declaring that changes relating to a child's age or a parent's living or working conditions may constitute a material change in circumstances, the General Assembly has plainly expressed its intent to permit modification of residential parenting schedules based on changes that reasonably could have been anticipated when the original residential parenting schedule was established.

*Id.* The Court interpreted Tenn. Code Ann. § 36-6-101(a)(2)(C) to reflect the legislature's "'policy decision to make it easier to establish that a material change in circumstances has occurred' when a party seeks to modify a residential parenting schedule." *Id.* (quoting *Boyer,* 238 S.W.3d at 259). The Court, therefore, held:

> [F]acts or changed conditions which reasonably could have been anticipated when the initial residential parenting schedule was adopted may support a finding of a material change in circumstances, so long as the party seeking modification has proven by a preponderance of the evidence "a material change of circumstance affecting the child's best interest."

*Id.* at 704 (quoting Tenn. Code Ann. § 36-6-101(a)(2)(C)). The Court added that, even under prior caselaw, the "reasonably anticipated" factor "was never intended to be outcome-determinative." *Id.*

Applying its holding to the facts before it, the *Armbrister* Court reversed this court's decision and reinstated the trial court's determination that there had been a material change in circumstances. *Id.* The Court made the following observations concerning the relevant proof:

> The proof is undisputed that, as a result of the sale of his 50% interest in the Greeneville dentistry practice and the purchase of a dentistry practice in Johnson City, Father worked fewer Fridays and had greater flexibility and control of his work schedule, both of which allowed him to spend more time with the children than he could have at the time when the residential parenting plan was established. That Father lived a greater distance from the children after his relocation and spent more of his parenting time with them

in transit are also undisputed facts. The children, who were three and not quite one at the time of the divorce, were five and three years old at the time of the modification proceeding. Finally, the proof established that Father had remarried and that Mrs. Armbrister had developed and maintained a positive relationship with Mother and the children.

*Id.* at 704-05. Through this proof, the father aimed to establish a material change in circumstances based upon "'significant changes in the needs of the child[ren] over time, which may include changes relating to age' and 'significant changes in the parent's living or working condition that significantly affect parenting.'" *Id.* at 705 (quoting Tenn. Code Ann. § 36-6-101(a)(2)(C)). The Court determined that the evidence did not preponderate against the trial court's finding that the father had met his burden of proof. *Id.* In reaching this conclusion, the Court agreed with the dissenting judge on this court that the father's "remarriage significantly affected his parenting in a positive way." *Id.* After citing the mother's primary parenting role at the time of the divorce and the fact that the father "had 'spent considerable portions of his recreational time traveling and playing golf' during the marriage," the Court emphasized that the proof at the modification hearing showed "that Father's move and adjustment of his work schedule now allow him to participate enthusiastically in his son's extracurricular activities and that he is looking forward to participating in his daughter's activities as well." *Id.* The Court also noted the positive relationship between the stepmother and the children. *Id.*

Although the Court in *Armbrister* was not presented with the issue of whether there must be proof that the change in circumstances affects the child's well-being in a meaningful way in order to modify a residential parenting schedule, the Court's holding seems to offer some guidance on this issue. Based upon the reasoning applied and the result reached by the Supreme Court in *Armbrister*, it appears that, for purposes of modifying a residential parenting schedule, a petitioner can establish that a material change of circumstances affects the child's well-being in a meaningful way through evidence of changes to the petitioner's circumstances (as described in Tenn. Code Ann. § 36-6-101(a)(2)(C)) that will allow more parenting time and/or a better parent-child relationship in the future. Thus, in *Armbrister*, the father was not required to show that the changes in circumstances *had affected* the children's well-being but that, because of changes in the father's "living or working condition that significantly affect parenting," Tenn. Code Ann. § 36-6-101(a)(2)(C), he would be able to participate more in the children's lives and exercise more residential parenting time in the future. *Id.* at 705.

This interpretation is consistent with post-*Armbrister* cases from this court involving petitions to modify residential parenting schedules. This court reversed the trial court's decision in *Cook v. Cook*, No. M2015-00253-COA-R3-CV, 2015 WL 8482403, at *1 (Tenn. Ct. App. Dec. 9, 2015), a case in which the trial court denied the father's petition for modification based upon changes in his work schedule, the remarriage of both parties, and the child beginning school. The trial court reasoned that the father failed to show a

- 12 -

material change in circumstances because he had not shown that the alleged changes "actually affected the child's best interest." *Cook*, 2015 WL 8482403, at *2. In reversing the trial court, this court cited the significant changes in the father's work schedule. *Id.* at *5. Whereas the father had previously worked the midnight shift, his new work schedule gave him greater flexibility and allowed him to spend most evenings at home. *Id.* Both parents testified that they had "failed to adhere strictly to the parenting plan." *Id.* Moreover, the evidence showed that the father's remarriage had "affected his parenting in a positive way" and that the child had a close relationship with his stepmother, who assisted the father with parenting responsibilities when needed. *Id.* Under these facts, we determined that the trial court had erred in failing to find a material change in circumstances for purposes of considering modification of the residential parenting schedule. *Id.*

In *Wilkerson v. Wilkerson*, No. M2014-02412-COA-R3-CV, 2016 WL 3044371, at *4 (Tenn. Ct. App. May 19, 2016), this court reversed the trial court's finding that there was no material change of circumstances sufficient to modify the residential parenting schedule. In so doing, we cited the fact that seven years had passed since the entry of the original parenting plan ("which suggests the possibility for changes"), that both parents agreed that the current parenting plan was no longer working, "additions to both Mother's and Father's families, and the fact that Father, who is on active duty with [the] U.S. Army, is no longer eligible to deploy." *Wilkerson*, 2016 WL 3044371, at *4.

There are cases involving petitions for modification of the residential parenting schedule in which this court has affirmed a trial court decision finding no material change of circumstances where we have cited the absence of any evidence of impact of the alleged changes on the child. In *In re Caroline U.*, No. E2018-01951-COA-R3-JV, 2019 WL 4896860, at *2 (Tenn. Ct. App. Oct. 4, 2019), for example, we noted that "there was little to no evidence presented regarding how the alleged changes in Father's circumstances have impacted the Child," and "Counsel for Father did not identify any concerns or problems with the Child's care." The facts in that case, however, showed no change in relationship status, no relocation, no career change, and no proof that the parties were not abiding by the current plan. *In re Caroline U.*, 2019 WL 4896860, at *4. The father's mother still cared for the child while the father worked and attended school. *Id.* Thus, there was no basis for the trial court to find that the father was in a better position to participate in the parenting of the child.

The father in *Akins v. Akins*, No. M2017-00594-COA-R3-CV, 2019 WL 2880051, at *1 (Tenn. Ct. App. July 3, 2019 ), requested a modification of the residential parenting schedule alleging a material change in circumstances based upon his improved health, increased flexibility in his work schedule, his relocation closer to the mother and the child, and the development of a meaningful relationship between the stepmother and the child. The trial court found that "little had truly changed" since an earlier agreed parenting plan and dismissed the father's petition. *Akins*, 2019 WL 2880051, at *2. The trial court found that "[m]erely proving that Father is working less hours . . . does not show that this affects

the child's well being in a meaningful way" and observed that "Father chose to not have his Wife testify about her relationship with the minor child." *Id.* at *3. On appeal, this court concluded that the evidence did not preponderate against the trial court's findings that the father had not proven any changes that had not been considered as part of the prior agreement between the parties. *Id.* at *4.

As stated under our standard of review, a trial court's determination as to whether there has been a material change of circumstances is a finding of fact. *Armbrister*, 414 S.W.3d at 692. In both *Akins* and *In re Caroline U.*, the evidence did not preponderate against the trial court's finding on that issue. *See also Kelly v. Kelly*, No. M2015-01779-COA-R3-CV, 2016 WL 6124116, at *6 (Tenn. Ct. App. Oct. 19, 2016) (affirming trial court's decision denying petition to modify the residential parenting schedule and noting that "Father failed to meet his burden of proving that any allegedly material change occurred that affected the wellbeing of the parties' daughter"; although the father testified credibly of his concerns about the daughter's social media use and academic performance, he presented no evidence that the mother failed to provide proper supervision.).

The results in cases decided under Tenn. Code Ann. § 36-6-101(a)(2)(C) are fact-dependent. Does the evidence in this case preponderate against the trial court's determination that Father established a material change in circumstances for purposes of modifying the residential parenting schedule? We have concluded that the trial court did not err. The facts in this case are, in many ways, similar to those before the Court in *Armbrister*. Danica is a happy and well-adjusted child. But, the proof shows that circumstances have changed since the entry of the original residential parenting schedule and those changes affect the parenting relationship. The material changes of circumstances established by Father's proof fall within the statutory categories of "significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting." Tenn. Code Ann. § 36-6-101(a)(2)(C). Because of the change in Danica's age, the court recognized the differences in her "needs and relationships" as compared to when the original parenting plan was devised. Moreover, because of changes in Mother's and Father's residences, maturity levels, and family composition, the trial court found improvement in the parents' abilities to share parenting responsibilities. The trial court, therefore, found that there had been a material change in circumstances under Tenn. Code Ann. § 36-6-101(a)(2)(C). Based upon the record, we conclude that the evidence does not preponderate against this finding.

II.     Best interests.

Once the trial court determines that there has been a material change in circumstances, the second step in the modification analysis requires the court to determine whether modification is in the child's best interests under the factors in Tenn. Code Ann. § 36-6-106(a). *Armbrister*, 414 S.W.3d at 705 (citing Tenn. Code Ann. §§ 36-1-

101(a)(2)(C), 36-6-401(a)). We disagree with Mother's assertion that the trial court failed to analyze the statutory factors.

Tennessee Code Annotated section 36-6-106(a) requires the trial court to consider the following factors in determining the best interests of the child:

> In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
> (3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;
> (4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
> (5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
> (6) The love, affection, and emotional ties existing between each parent and the child;
> (7) The emotional needs and developmental level of the child;
> (8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;
> (9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;
> (10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

- 15 -

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

The best interest determination "is a fact-sensitive inquiry." *Steakin v. Steakin*, No. M2017-00115-COA-R3-CV, 2018 WL 334445, at \*5 (Tenn. Ct. App. Jan. 9, 2018). The determination "'does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent.'" *Id.* (quoting *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)). Rather, "'[t]he relevancy and weight to be given each factor depends on the unique facts of each case.'" *Id.* (quoting *In re Marr*, 194 S.W.3d at 499).

Although the trial court did not clearly demarcate its transition from a consideration of whether a material change of circumstance had been established to the best interest analysis, "its findings demonstrate a consideration of the relevant factors." *Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at \*6 (Tenn. Ct. App. Apr. 29, 2015). The following excerpt from the trial court's ruling contains references to multiple statutory factors:

> In addition to that, I would note that nine years ago the wording in the statute, the legislature has stated an intent for the Court to try to *maximize parenting time with both parents* [factor in introduction of Tenn. Code Ann. § 36-6-106(a)] where possible and where it's feasible in any form, and the case law would support the legislature's designation of that. You can agree with that or not. I'm just telling you, basically, there's been a migration in the state of the law that is more geared toward, where possible, expanding parenting time. We don't have a lot of cases anymore unless there's drugs or abuse or things like that where we're limiting parenting time. We don't have any other every-other-weekends and two-weeks-in-the-summer parents these days. And that's just the state of migration of the law.

> In this case, as I noted, both parents are *good people* [factor 8]. They both have *good homes* [factor 4]. There is *good social networks* around the homes [factors 9, 12]. They have got some disagreements in issues but, you

- 16 -

know, on a scale of issues, I'm not stating they are not important to each of you and to the child, but in a scale of issues and disputes, they are not major, and they seem within your capabilities of easily resolving.

Now, obviously, *capability and willingness* become sort of sparse in words and so you have to get into that. But, certainly, these are not issues that should confound or bring you to the level of where you just can't work together. They are within your grasps to work out. *And there's really no reason that I can see that there's any sort of major issue between you that can't be resolved.* [factor 2]

In all candor, it's rare to see a case, frankly, that's more suited to equal parenting time. Largely, due to the *stature of parents* [factors 2, 8], the -- the *child's being so well-adjusted and being so high-functioning* [factors 1, 6] and the *distance between the parties* [factor in introduction of Tenn. Code Ann. § 36-6-106(a)], in the Court's judgment, this case is well-suited for a designation of equal parenting time. Therefore, the Court does adopt the father's parenting plan as admitted into evidence as Exhibit Two, finding that plan to be in the child's best interest, finding that there was, in fact, a material change of circumstance based on the previously announced factors.

(Emphasis added.) Thus, contrary to Mother's contention, the trial court made findings concerning the statutory best interest factors. Furthermore, the evidence does not preponderate against the trial court's determination that modification of the residential parenting schedule was in the child's best interest.[8]

CONCLUSION

The judgment of the trial court is affirmed, and the costs of appeal are taxed against the appellant, Colleen Erin Daley. Execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[8] A trial court is required to use the process set forth in Tenn. Code Ann. § 36-6-404(b) to determine how the residential parenting plan should be modified. *Armbrister*, 414 S.W.3d at 706.